320 So.2d 581 (1975)
Martial H. VOITIER
v.
James C. FARRELLY, Individually and as natural tutor of the minor, Wendy M. Farrelly.
No. 6920.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1975.
Rehearing Denied November 11, 1975.
*582 Porteous, Toledano, Hainkel & Johnson, Goeffrey H. Longenecker, New Orleans, for plaintiff-appellee.
Dufour, Levy, Marx, Lucas & Osborne, Patrick Rankin, New Orleans, for defendants-appellants.
Before SAMUEL, BOUTALL and BEER, JJ.
SAMUEL, Judge.
This is a suit for property damage, temporary car rental, depreciation, and inconvenience resulting from an automobile collision. Martial H. Voitier is the only plaintiff in the original petition, but by supplemental petition Action Towing and Rental, Inc. also was made a plaintiff. The two petitions prayed for judgment in the amount of $20,200.43. However, on the morning of trial plaintiffs orally amended the petitions so as to include additional, newly discovered damage in the amount of $5,211.92.
Following trial on the merits, judgment was rendered in favor of plaintiffs in the sum of $9,170.34, itemized in the Reasons for Judgment as $1,908.83 for originally claimed damage, $4,749.77 for the newly discovered damage, and $2,511.74 for car rental. Defendant has appealed. In this court he concedes liability and the correctness of the $1,908.83 item for originally claimed damage. His appeal is directed to causation and quantum as to the other two items. He contends plaintiffs failed to prove a causal connection between the accident and the newly discovered damage and failed to mitigate the car rental damage.
The accident occurred on the morning of March 5, 1974 when the corporation's *583 Bentley, parked in front of Voitier's home, was struck by a Volkswagen owned by the defendant and driven by the latter's minor daughter. The front of the Volkswagen collided with the front of the Bentley. The accident occurred when the Volkswagen driver attempted to open a vent window to get rid of a bee in her car.
Voitier testified that as president of the plaintiff corporation he needs an impressive automobile to entertain important clients at theatres and restaurants. In 1973 the corporation purchased the 1956 Bentley for $6,500 and spent approximately $1,800 making various repairs and adding air conditioning. Prior to the accident the body, exterior and interior were in good condition and the engine and running gear were in excellent condition. According to Voitier, the collision knocked the Bentley thirty-seven feet to the south in front of his neighbor's home with the Volkswagen stuck in its grill. However, Mrs. Farrelly, wife of the defendant and mother of the driver of the Volkswagen, testified that when she arrived on the scene five minutes after the accident the Bentley was still in front of Voitier's home and the Volkswagen was about two feet away from the Bentley. Wendy Farrelly, the Volkswagen driver, did not remember whether the Bentley moved after it was struck.
On the day of the accident, Voitier had the car towed to Durham Motors, specialists in the repair of foreign automobiles. Durham informed him it would take six to nine months to get the necessary parts. Voitier did not order the parts but discussed the repairs with Eric Halverson, an adjuster for defendant's insurer. Upon learning the parts would not be available for six to nine months, Halverson offered to secure them himself. Halverson was unable to locate the parts despite the fact he made serious efforts to do so throughout the United States. Relying on Halverson, Voitier did not order the parts from Durham.
Because of the need for a replacement vehicle while the Bentley was out of service, Voitier discussed a rental vehicle with Halverson. After rejecting proposals of smaller automobiles, which Voitier felt were incompatible with his company's needs, the insurer agreed to permit him to rent a Cadillac at a cost of $22 per day. Sometime later, when Halverson admitted he was unable to secure parts, he discussed settlement. The insurer proposed payment of the repairs as per the originally claimed damage and offered $500 toward the car rental (which then amounted to over $1,300). Voitier rejected this offer and consulted an attorney. He then took the car to a mechanic who made temporary front end body and fender repairs while plaintiff was awaiting a settlement so that he could order and pay for new parts for permanent repairs. The car was repaired only to a limited extent because of the lack of parts. Plaintiff was charged $500 for these repairs.
Shortly after the accident had occurred, Voitier was contacted by David Kaufman, a local specialist in the filed of Bentley automobiles, who had used parts. Kaufman was interested in buying the Bentley and offered $3,000, which he considered was the wholesale price of the automobile. Kaufman later testified he was of the opinion the retail value of the car in its damaged condition was $7,500 to $8,000 and because he had the parts he could have fixed it himself and sold it at a profit. Voitier did not choose to sell the car, nor did he inform Halverson that Kaufman had used parts available.
After the temporary repairs were made, the Bentley was driven approximately 2,000 miles. When Voitier began using the car after the accident in suit, he noticed a small amount of vibration. He testified that prior to the accident there had been no vibration. He attributed the vibration to the fact that the car had been "laid up awhile", and this item was not included in *584 the original damage estimate. However, the vibration got progressively worse to the point where it became excessive. On the day of trial, Thomas Helm, a Durham mechanic, examined the car relative to the vibration problem. Kaufman also drove the car on that day in an effort to determine the cause of the vibration. It is clear that, in addition to the original damage claimed, at the time of trial the vehicle had a serious vibration problem and a bent propeller shaft.[1] This vibration and bent shaft are the damages constituting the oral amendment to the petitions, the awarded item we have referred to as newly discovered damage.
Testimony pertinent to appellant's first contention relative to causal connection between the accident and the newly discovered damage was given on behalf of plaintiffs by Voitier himself and by Thomas Helm, the Durham mechanic, and on behalf of the defendant by David Kaufman. Both Helm and Kaufman qualified as experts on Rolls Royce and Bentley automobiles (the two vehicles are manfactured in England by the Rolls Royce Company). That portion of Voitier's testimony which is concerned with this contention is set out in the preceding paragraph.
Helm, 25 years of age, has been employed as a mechanic by Durham for three years and has had special training at the Rolls Royce Training School at Paramus, New Jersey for twelve days and at their school in Dallas, Texas for four days. During the past three years he has repaired many Bentleys. He was of the opinion the vibration now evident in the Bentley is due to damage to the spring drive assembly and a bent propeller shaft, both of which he attributed to the collision with the Volkswagen. He estimated the total repair cost of this damage was $4,749.77, itemized as follows: spring drive assembly $3,398.94, labor $225; new propeller shaft $813.88, labor $37.50; total tax 268.85.
Kaufman has been involved with automobiles since he was fourteen years old, disassembling them to the bare chassis and "doing everything" to restore the cars. Since 1960 he has specialized in the restoration and sale of Bentley and Rolls Royce automobiles for his own company, making twice yearly trips to Europe to purchase these vehicles and returning with them to the United States where they are restored and resold. He has done all phases of the disassembling and restoring himself, but it is now done by his employees under his supervision.
Kaufman conceded it was difficult to determine the cause of the vibration by simply driving the car and by the visual inspection he had made (he did not inspect the undercarriage). He was of the opinion that if the car was put up on a rack and the transmission engaged so that the propeller shaft was rotating, it would most likely indicate the problem was with the universal joint, the harmonic balance wheel, or an out-of-balance propeller shaft. However, Kaufman was of the firm opinion the bent propeller shaft could not have been caused by the collision with the Volkswagen; the shaft could be bent only by driving the car over and striking a curb or by driving it over and striking a rock or some other obstacle in its path. In all Kaufman's experience he has never seen a bent propeller shaft in a Rolls Royce or Bentley.
We agree with Kaufman on the question of the bent propeller shaft. When the young Volkswagen driver attempted to get rid of the bee in her car, she was only a short distance from the Bentley and traveling between 20 and 25 miles per hour. While leaning over to open the vent window, she took her foot off the accelerator and applied the brakes. The collision resulted in minor damage to the front of the Volkswagen, which was able to drive off under its own power.
*585 The only visual damage to the Bentley was to the front end, such as bumper brackets, license plate holder, gravel shields, front electric Lucas horns and fog lamps, front grill frame and assembly, and left front fender; neither the engine nor its mounts were damaged in any way. Under these circumstances we must and do agree with Kaufman's testimony, that it was impossible for the collision in suit to bend such a heavy, strong part as the Bentley propeller shaft. Accordingly, we disallow the claim relative to the bent shaft and reduce the judgment by the sum of $902.46, the amount of the Helm estimate of the cost of a new shaft, the labor involved in replacing the shaft, and the 6% tax thereon.
We are of the further opinion plaintiff has proved the damage to the spring drive assembly was caused by the accident. There is no contradiction of the fact that the collision could have caused that damage and, as we read the record, the damage to the spring drive assembly alone was sufficient to cause the excessive vibration.
Relative to appellant's second contention regarding plaintiffs' alleged failure to mitigate the car rental damage, our settled jurisprudence is that the owner of an automobile damaged by a tort feasor may rent another car necessary for his business while his damaged automobile is being repaired, and may recover the amount paid for the rental of the substitute vehicle.[2] It is also settled that such an owner is required to mitigate damages by having the repairs made promptly.[3] Failure to minimize is not a complete bar to recovery of the rentals; such failure affects only the amount recoverable; and in determining the reasonableness of the time needed to make the repairs the uncontrollable delay of the repairman in securing the parts necessary to complete the work should be considered.[4]
In the instant case appellant contends the Bentley could have been repaired by Durham within ten days after receipt of the necessary parts, which could have been obtained from Kaufman, and Voitier should have informed the insurer when he discovered Kaufman had available parts. Thus, they claim the vehicle could have been repaired within approximately three weeks after the accident and the award for car rental should be reduced accordingly. We do not agree.
The obtaining of new parts was a serious problem, not comparable to the simple matter of obtaining parts for a relatively new automobile manufactured in this country. And while it is true Kaufman did tell Voitier he had the parts needed to repair the Bentley, these were used parts and it is clear Kaufman was interested in buying the damaged vehicle to repair it for his own account. The record does not show he offered to sell the necessary parts, that he was interested in making such a sale, or even that he would have sold the parts if requested to do so.
The Cadillac was rented by Voitier some five or six days after the accident and following the insurer's acquiescence in that rental. Very shortly after the negotiations *586 with the insurer came to an end, Voitier took the Bentley to his mechanic for the temporary repairs, which took ten days to complete, and returned the rented vehicle. He used another, nonrented vehicle while the temporary repairs were being made and he used the Bentley after those repairs had been made. In all the Cadillac was rented for something less than four months. We agree with the trial judge who concluded this length of time was not unreasonable under all of the circumstances.
For the reasons assigned, the judgment appealed from is amended so as to reduce the amount awarded from the sum of $9,170.34 to the sum of $8,267.88. As thus amended, and in all other respects, the judgment appealed from is affirmed. Costs of this appeal are to be paid by the plaintiffs-appellees.
Amended and affirmed.
BEER, Judge (concurring in part, dissenting in part).
I respectfully dissent from that portion of the majority opinion dealing with the alleged damage to the spring drive assembly.
The total award for this alleged item of damages is:

1. Spring drive assembly $3,398.94
2. Labor 225.00
 _________
 $3,623.94
3. Tax at 6% of the above 217.44
 _________
 TOTAL $3,841.38

Although I agree with the balance of the majority opinion and concur in it with respect to all other findings, I do not feel that this particular item of damages was sufficiently proven even though no clear contravening evidence was produced by the defendant. The alleged discovery of the need for this remarkably expensive item of repair was the result of only the most superficial and, at least in my opinion, unsatisfactory investigation.
Mr. Thomas Helm was the only witness to give any evidence with respect to this item of damages. He says that there was a possibility that the accident could have caused trouble with the spring drive assembly. At first he was unable to say whether the vibration problem predated the accident but then changed his testimony on this point. However, the most compelling indication of the cavalier manner in which he conducted his so-called examination was the clear showing that he never made even a visual inspection of the actual parts that he described as damaged and had only superficially examined the car itself when it was in the body shop of Durham Motors for body work. The fact that he makes this expensive estimate based on virtually no investigation causes me to reject his testimony on this issue and to conclude that the record is barren with respect to any proof of this item of damages.
I agree with the majority's rejection of plaintiff's claim relative to the propeller shaft (about which, incidentally, Mr. Helm also testified, stating, quite categorically, that it was an item of damages attributable to the accident).
Accordingly, I respectfully dissent from that portion of the judgment which holds that there was adequate proof of a causal connection between the accident and the so-called newly discovered damage to the spring drive assembly. I believe there was a failure of proof both with respect to causal connection and the actual damage incurred. I would reduce the judgment to $4,426.50.
NOTES
[1] In this country the part is referred to as a drive shaft.
[2] Goode v. Hantz, 209 La. 821, 25 So.2d 604; Desselle v. Wilson, La.App., 200 So.2d 693; Vance v. Hinton, La.App., 200 So.2d 341; Plotkin v. Martino, La.App., 192 So.2d 381; National Motor Club of La., Inc. v. American Indem. Co., La.App., 170 So.2d 729; Cook v. Southern Farm Bureau Cas. Ins. Co., La.App., 124 So.2d 183; Moore v. Shreveport Transit Co., La.App., 115 So.2d 218; 8 Am. Jur.2d "Automobiles and Highway Traffic" § 1047; see also 6 Blashfield Cyclopedia of Automobile Law and Practice, § 3417 and cases cited therein.
[3] National Motor Club of La., Inc. v. American Indem. Co., supra, footnote 2; Baremore v. Southern Farm Bureau Casualty & Ins. Company, La.App., 147 So.2d 58; Alderman v. Henderson, La.App., 130 So.2d 157.
[4] Desselle v. Wilson, supra, footnote 2; Baremore v. Southern Farm Bureau Casualty & Ins. Co., supra, footnote 3; Alderman v. Henderson, supra, footnote 3.